JAMES P. McDONALD
New York Bar No. 4823910
Colo. Bar No. 61599
McDonaldJa@sec.gov
ZACHARY T. CARLYLE
Colo. Bar No. 34962
CarlyleZ@sec.gov
JEREMY GRAVES
Colo. Bar No. 45522
GravesJe@sec.gov
SECURITIES AND EXCHANGE
COMMISSION
1961 Stout Street, Suite 1700
Denver, Colorado 80294-1961
Telephone:   (303) 844-1000
Facsimile:    (303) 297-3529

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States Securities and Exchange Commission,<br><br>Plaintiff,<br><br>v.<br><br>Fred W. Wagenhals;<br>Robert D. Wiley; and<br>Christopher D. Larson,<br><br>Defendants. | Case No.<br><br><br><br>**COMPLAINT AND JURY DEMAND** |

Plaintiff United States Securities and Exchange Commission (the "SEC"), for its Complaint against Defendants Fred W. Wagenhals, Robert D. Wiley, and Christopher D. Larson (collectively, the "Defendants"), alleges as follows:

COMPLAINT                                1

## **INTRODUCTION AND SUMMARY**

1.      This case involves disclosure and accounting frauds and related misconduct committed by the former executive management of AMMO, Inc. ("Ammo" or the "Company"), a publicly traded company based in Scottsdale, Arizona, that has now been renamed Outdoor Holding Company.  The fraudulent conduct included Defendants Fred Wagenhals, Ammo's former Chief Executive Officer ("CEO"), and Robert Wiley, Ammo's former Chief Financial Officer ("CFO"), making repeated materially false and misleading statements in Ammo's public SEC filings and financial statements that generally had the purpose of hiding or obfuscating unfavorable information about the management and operations of the company.  The false and misleading statements included hiding that one of Ammo's key business leaders, and a co-founder of the company, Defendant Christopher Larson, played a critical executive and management role notwithstanding a federal court order from 2020 that prohibited him from holding and performing an executive role at a public company.  Further, Ammo's public reports and financial statements were replete with misleading statements and omitted information, and also contained fundamental accounting errors, which Wagenhals and Wiley approved and certified while knowing information in the reports was inaccurate.

2.      Not only did Larson's undisclosed, senior role at Ammo enable him to lead major business operations of the company in contravention of a court order, including the negotiations for the most significant acquisition in Ammo's history, it also allowed him to arrange a series of transactions where Larson or a member of his family would benefit financially.  These related party transactions included Ammo contracting with a company owned by Larson's brother to build a $25 million manufacturing facility and a kickback scheme where an Ammo vendor shared one-half of the fees Ammo paid to it with Larson.

3.      Over several years, CEO Wagenhals and CFO Wiley repeatedly covered up and attempted to hide Larson's problematic role and conduct, which included them making repeated false and misleading statements to Ammo's outside auditors, and failing to disclose related party transactions involving Larson and members of his family to the investing public.

4.      In addition, various of the Defendants falsely portrayed Ammo's financial condition and operations more favorably by, among other things, understating its expenses by improperly capitalizing certain investor relations costs, misrepresenting the reasons for a positive earnings metric, and deviating from Ammo's disclosed method of calculating stock-compensation expense.

5.      As a result of this and the other conduct alleged herein, Defendants have violated and, unless restrained and enjoined, will continue to violate multiple provisions of the federal securities laws.

## DEFENDANTS AND RELEVANT ENTITIES

6.      AMMO, Inc., which presently operates under the name Outdoor Holding Company, was a Delaware corporation with its principal office in Scottsdale, Arizona.  In December 2020, Ammo began trading on the Nasdaq Stock Exchange.  Prior to trading on the Nasdaq Stock Exchange, Ammo's stock was traded over the counter.

7.      At all times relevant to the allegations herein, Ammo's common stock was registered with the SEC pursuant to Section 12 of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78l].  Further, Ammo was required to file periodic reports, including Forms 10-K and 10-Q, with the SEC pursuant to Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and related rules thereunder.

8.      **Fred W. Wagenhals**, age 84, resides in Paradise Valley, Arizona.  Wagenhals co-founded Ammo with Larson in 2016.  From approximately December 2016 and continuing through July 2023, Wagenhals worked as Ammo's

Chairman of the Board and CEO.  In July 2023, Wagenhals transitioned to become Ammo's Executive Chairman, and he departed Ammo's board in April 2025.

9.   **Robert D. Wiley**, age 34, resides in Scottsdale, Arizona.  Wiley is a Certified Public Accountant ("CPA") licensed in the state of Arizona.  From May 2018 through January 2019, Wiley was Ammo's controller, and from January 2019 through September 20, 2024, when he resigned at the request of Ammo's board of directors, Wiley served as Ammo's CFO.

10.   **Christopher D. Larson**, age 53, resides in Cave Creek, Arizona.  Larson co-founded Ammo in 2016.  Larson was a CPA licensed in Minnesota until his license was revoked in July 2021.  Between approximately 2017 and 2022, Larson held a role with the responsibilities of an executive officer and member of Ammo's management, including the title of Vice President of Finance, and oversaw critical operations of Ammo.  Throughout his tenure at Ammo, Larson held a position subordinate only to Wagenhals and was senior to, or equivalent to, other named executive officers.  Ammo terminated Larson in November 2022.

### JURISDICTION AND VENUE

11.   The SEC brings this action pursuant to authority conferred on it by Sections 20(b), 20(d)(1), and 20(e) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77t(b), 77t(d)(1), and 77t(e)] and Sections 21(d)(1), (2), (3), (5) and (7), and 21(e) of the Exchange Act [15 U.S.C. §§ 78u(d)(1), (2), (3), (5), and (7) and 78u(e)] to restrain and enjoin the Defendants from engaging in the acts, practices, and courses of business described in this Complaint and similar acts, practices, and courses of business.  The SEC seeks permanent injunctions, civil penalties, and officer and director bars against Wagenhals, Wiley, and Larson; disgorgement of Larson's ill-gotten gains derived from the conduct alleged in the Complaint plus prejudgment interest thereon; and reimbursement from Wagenhals and Wiley to Ammo of certain compensation and profits.

12.    In connection with the acts, practices, and courses of business alleged herein, Defendants, directly or indirectly, singly and in concert, made use of the means or instruments of transportation or communications in interstate commerce, the means or instrumentalities of interstate commerce, or of the mails, including within this District.

13.    This Court has jurisdiction over this action pursuant to Sections 20(b), 20(d)(1), 20(e), and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b), 77t(d)(1), 77t(e) and 77v(a)] and Sections 21(d)(1), (2), (3), (5), and (7), 21(e), and 27(a) of the Exchange Act [15 U.S.C. §§ 78u(d)(1), (2), (3), (5), and (7), 78u(e), and 78aa(a)].

14.    Venue is proper in the District of Arizona pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)], Section 27(a) of the Exchange Act [15 U.S.C. § 78aa(a)], and 28 U.S.C. § 1391(b).  Each of the Defendants resides in this District, and certain of the acts and transactions constituting violations of the Securities Act and the Exchange Act occurred in this District, including the offer and sale of Ammo securities.

15.    In May 2025, each of Wagenhals, Wiley, and Larson entered into agreements with the SEC to toll the running of any statute of limitations applicable to any action or proceeding arising out of the SEC's investigation entitled In the Matter of Ammo, Inc. (D-04083), from which this action and the allegations herein arise, for the period of May 1, 2025 through August 29, 2025.

## FACTUAL ALLEGATIONS

I.    **Relevant Background**

A.    **Ammo's Founding by Wagenhals and Larson and the Company's Early Growth**

16.    In approximately 2016, Wagenhals met Larson, and, along with a third individual ("Co-Founder"), agreed to pursue acquiring the assets of an ammunition manufacturing facility in Payson, Arizona, with the purpose of starting

their own company.  Larson and Co-Founder informed Wagenhals that their goal would be to take such a business public.  Near the time of their initial discussions, both Larson and Co-Founder informed Wagenhals that they could not become officers of this new company.  In particular, Larson informed Wagenhals that he was then under investigation by the SEC.

17.    From late 2016 through early 2017, Wagenhals organized a predecessor company to Ammo that was eventually combined, by a reverse merger, with a shell company called Retrospettiva, Inc. that had a public distribution of securities which traded over the counter.  As a result of these transactions, Retrospettiva was renamed AMMO, Inc., its trading symbol was changed to "POWW," and Wagenhals became the sole director of the company.

18.    From at or near the time of Ammo's commencing operations in 2017, Wagenhals held the title of CEO, Larson held the title of Vice President of Finance, and Co-Founder held the title of Chief Marketing Officer.  At that time, Wagenhals, Larson, and Co-Founder held positions at Ammo that were senior in the organization to all other employees, including the Chief Operating Officer ("COO") and CFO.

19.    Wiley joined Ammo as its controller in approximately April 2018, and he became the CFO in January 2019 after the prior CFO resigned.  At the time he was hired, Wiley was Wagenhals's stockbroker's son-in-law, was 27-years old, and had never held a corporate-officer position.  After Wiley assumed the role of CFO, Larson continued to hold a position and responsibilities senior to Wiley through 2022.

20.    Beginning with Ammo's Form 10-K filed on April 11, 2018, the company repeatedly stated in its public filings that one of its primary business objectives was pursuing strategic acquisitions and developing strategic relationships.  Between 2017 and 2020, Ammo substantially increased its sales revenues, based in part on its corporate acquisitions.  Between fiscal year 2017 and

fiscal year 2021, Ammo's sales increased from approximately $1.3 million to $62.4 million.

21.    On April 30, 2021, Ammo entered into a merger transaction under which it acquired ownership of a group of companies that did business as GunBroker.com, an online marketplace.  To date, this was Ammo's largest acquisition.  After the acquisition, Ammo had two primary business lines—manufacturing and the online marketplace GunBroker.com.

22.    During the timeframe relevant to the allegations herein, Ammo regularly offered and sold securities, including stock, as defined in Section 2(a)(1) of the Securities Act and Section 3(a)(10) of the Exchange Act [15 U.S.C. §§ 77b(a)(1) and 78c(a)(10)].

23.    Ammo regularly awarded its common stock to its executives, employees, and board of directors.  Also, Ammo periodically issued common stock to third parties for services and goods purchased.  In late 2020, Ammo sold about 9.5 million shares of common stock in a secondary offering at $2.10 per share.  In early 2021, Ammo sold another 20 million shares of common stock at $5.00 per share.  And in May 2021, Ammo sold about 1.4 million shares of 8.75% Series A Cumulative Redeemable Perpetual Preferred Stock at $25.00 per share.

**B.    Larson Acted as a *De Facto* Executive Officer of Ammo Throughout His Tenure.**

24.    For the benefit and protection of the investing public, the federal securities laws and regulations mandate the disclosure of specific information by public companies in certain of their public reports and proxy statements.  Among other things, public companies are required to identify their executive officers and significant employees and disclose their business experience and any significant legal history, including certain criminal convictions and injunctive orders.  In general, an executive officer is a "president, any vice president of the registrant in charge of a principal business unit, division or function (such as sales,

administration or finance), any other officer who performs a policy making function or any other person who performs similar policy making functions for the registrant." 17 C.F.R. § 240.3b-7. A person who acts as an executive officer of a public company, even if he or she has not been given such a title, is defined as an executive officer under the securities laws and regulations. These laws and regulations also require public companies to disclose the compensation of their highest-paid executive officers.

25. In April 2016, the SEC filed a lawsuit against Larson and others in the United States District Court for the Southern District of California in a matter entitled *SEC v. Zouvas*, *et al.*, Case No. 16-CV-00998 (CAB), which alleged violations of Sections 17(a)(1) and (3) of the Securities Act [15 U.S.C. §§ 77(q)(a)(1) and 77(q)(a)(3)] and Section 10(b) and Rules 10b-5(a) and 10b-5(c) of the Exchange Act [15 U.S.C. § 78j(b) and 17 C.F.R. §§ 240.10b-5(a) and 240.10b-5(c).] The SEC alleged in this earlier lawsuit, among other matters, that Larson had acted as *de facto* chief financial officer of a company called Crown Dynamics Corporation ("Crown") but that Larson's "name did not appear in any of Crown's filings with the Commission." The prior lawsuit was transferred to the United States District Court for the District of Arizona in February 2017, and assigned case number 2:17-cv-00427 (SPL).

26. The SEC and Larson agreed to settle the prior lawsuit on or about March 13, 2020. As part of the settlement, Larson consented to entry of an order barring him from acting as an officer of a public company. On June 1, 2020, the Honorable Steven P. Logan, United States District Judge, entered a Partial Final Judgment against Larson (hereinafter the "Larson Court Judgment") that, among other things prohibited Larson:

> pursuant to Section 20(e) of the Securities Act, 15 U.S.C. § 77t(e), and Section 21(d)(2) of the Exchange Act, 15 U.S.C. § 78u(d)(2), for a period of five years from the date of entry of the Final Judgment, from acting as an officer or director of any issuer that has a class of securities

registered pursuant to Section 12 of the Exchange Act, 15 U.S.C. § 78l, or that is required to file reports pursuant to Section 15(d) of the Exchange Act, 15 U.S.C. § 78o(d).

27.     In addition, on June 3, 2020, the SEC suspended Larson from appearing or practicing before the SEC as an accountant pursuant to Rule 102(e) of the SEC's Rules of Practice [17 C.F.R. § 201.102(e)] (the "SEC Suspension").

28.     Throughout most of his tenure at Ammo, Larson used the title Vice President of Finance and also was referred to as a "Partner" (to Wagenhals). Larson, in fact, assumed and exercised the responsibilities of an executive officer of Ammo by at least 2017 and continued to exercise such job functions and authorities consistent with being a *de facto* executive officer until November 2022 when he departed Ammo.  Larson was a member of Ammo's executive management team, and he held the roles and responsibilities of an executive officer and assisted in the overall management of Ammo's operations, particularly in its capital markets, mergers and acquisitions, and business development functions.

29.     Between approximately 2017 and 2022, Wagenhals and Larson oversaw the operations and growth of Ammo, including by sharing an executive office suite, having frequent and often daily contact about Ammo's business, and coordinating with investment bankers to raise capital for Ammo.  During that period, Larson's job responsibilities included:

(a)     Providing input on key corporate decisions;

(b)     Soliciting individuals to join Ammo's board of directors;

(c)     Serving on Ammo's advisory board;

(d)     Identifying and participating in the hiring and employment-contract negotiations for other company officers, including the CEO who succeeded Wagenhals;

(e)     Developing the strategy for and executing corporate finance and fundraising activities, including common and preferred stock offerings;

(f)     Identifying and leading negotiations for corporate acquisitions, including for the acquisition of GunBroker.com;

(g)     Participating in hiring and terminating senior employees, including a person who served as audit committee chair and President;

(h)     Preparing materials for and attending meetings of the board of directors;

(i)     Reviewing corporate financial projections;

(j)     Playing a strategic role in procuring manufacturing equipment and raw materials;

(k)     Identifying vendors for Ammo and negotiating and signing contracts with vendors and third parties on behalf of Ammo;

(l)     Approving payments to vendors;

(m)     Identifying and recommending a contractor (his brother's company) to build Ammo's new manufacturing facility;

(n)     Providing direction on the content of and reviewing corporate financial filings before their submission;

(o)     Drafting, reviewing, and editing press releases, earnings releases, and earnings call scripts; and

(p)     Leading Ammo's investor relations activities, including by formulating strategies, meeting with investors and potential investors, and responding to analysts.

30.     Ammo also made representations to third parties that indicated that Larson held a role functionally equivalent to that of an executive officer, including after the Larson Court Judgment and SEC Suspension.  For example, the merger agreement for Ammo's largest transaction in its history—its acquisition of GunBroker.com—listed Larson, along with Wagenhals, Wiley, and an individual who served in a capacity similar to an in-house attorney ("In-House Counsel"), as the four "Key Employees" whose knowledge was imputed to the company.  Larson

1    was also listed as a key employee in certain of Ammo's other acquisition

2    agreements.

3    31.    In addition, Larson was the second-highest compensated executive

4    officer at Ammo, after Wagenhals, for Ammo's fiscal years ended March 31, 2020

5    ("FY 2020"), March 31, 2021 ("FY 2021"), and March 31, 2022 ("FY 2022"), and

6    the highest compensated executive officer in Ammo's fiscal year ended March 31,

7    2023 ("FY 2023").  His base compensation during those fiscal years always

8    exceeded $175,000, and Larson also received substantial incentive-based

9    compensation and stock awards during those years, including as further described

10   below.

11   32.    On May 20, 2025, Ammo filed an amendment to its fiscal year ended

12   March 31, 2024 ("FY 2024") Form 10-K, which restated certain information

13   contained in its previously issued financial statements for FY 2022, FY 2023, and

14   FY 2024, as well as restated its opening balance sheet as of the beginning of FY

15   2022 for the cumulative effect of the errors in prior periods (the "Restatement").

16   In the Restatement, Ammo described that, following an investigation by a special

17   committee of its board of directors, the special committee discovered accounting

18   and financial reporting errors that required restatement resulting primarily from (i)

19   inaccurate valuation of, and accounting for, share-based compensation awards to

20   employees, non-employee directors, and other service providers, and shares issued

21   in exchange for goods and services, (ii) inappropriate capitalization of certain share

22   issuance costs, and (iii) inappropriate accounting for certain convertible notes and

23   warrants issued by Ammo.  The Restatement further described that the special

24   committee found that Ammo had not properly disclosed certain executive officers,

25   executive compensation, and related party transactions.

26   33.    As part of its Restatement, Ammo disclosed that Larson was an

27   executive officer for FY 2022 and 2023, that Larson's salary for FY 2022 was

28   $698,465 (the third highest executive officer salary) and his total compensation

was $2,644,580 (the second highest), and for FY 2023 his salary was $1,337,187 (the highest) and total compensation was $1,514,990 (the highest).

### C.   Defendants' Systematic Efforts to Hide or Minimize Larson's Role and Responsibilities

34.    No later than mid-2020, after the Larson Court Judgment and SEC Suspension were in place, Wagenhals and Wiley took steps to hide, minimize, and obfuscate Larson's actual job responsibilities, executive officer role, and adverse disciplinary history from the company's investors and outside auditors.

35.    The steps Wagenhals and Wiley took to hide Larson's role and disciplinary history included preparing, signing, and certifying numerous SEC filings that excluded Larson from the lists and descriptions of Ammo's executive officers and represented that none of Ammo's executive officers had in the past ten years been subject to various disciplinary actions.  The steps also included preparing, signing, and certifying reports and financial statements that did not disclose related party transactions involving Larson, including obfuscating that Ammo hired a company owned by Larson's brother (called Larson Building) to construct a $25 million manufacturing facility.

36.    Wagenhals and Wiley also repeatedly lied to Ammo's outside auditors, who inquired about Larson's employment status and sought assurances that Larson had either left the company or was not involved in certain aspects of its business.  These misrepresentations were made, first, to a New-York-based independent registered public accounting firm ("Audit Firm #1") and, later, to a Texas-based independent registered public accounting firm ("Audit Firm #2"), both of which provided audit and disclosure review services to Ammo, as required by Section 13(a) of the Exchange Act and related rules thereunder.

37.    For example, beginning in or around June 2020, after the Larson Court Judgment was entered, Wiley falsely informed an employee of Audit Firm #1 that Larson was no longer involved with Ammo.  Similarly, in August 2020,

1  Wagenhals told Audit Firm #1 that Larson had quit.  Then, after Audit Firm #1

2  sought formal verification that Larson had quit in August 2020, Wagenhals and

3  Wiley falsely represented that Larson had resigned on August 13, 2020, and signed

4  a management representation letter on behalf of Ammo, dated August 19, 2020,

5  stating Larson was "not employed by the Company and he will not return as an

6  employee to the Company."  Nevertheless, Larson continued his work at Ammo

7  with Wagenhals, Wiley, and others.  For example, on August 19, 2020, Wagenhals

8  emailed Larson a draft term sheet for a secondary offering that Ammo was

9  considering and wrote "Chris [Larson], Time to make a decision.  Fred."  In

10  addition, on August 19, 2020, Wagenhals, Wiley, and Larson received an email

11  request from Ammo's investor relations firm asking them to review the upcoming

12  Form 10-Q filing "with a fine tooth comb and confirm everything is factual and

13  correct," which Larson himself forwarded to another person.  The next day, August

14  20, 2020, Larson sent an email from his Ammo email account to the financial firm

15  working on the secondary offering, copying Wagenhals, and wrote, in part: "Siting

16  [sic] with Fred [Wagenhals] what time are we doing the call. I thought I had it

17  saved."

18       38.    Indeed, in between Larson's alleged resignation on August 13, 2020,

19  and the August 19, 2020 representation letter stating that Larson no longer worked

20  at Ammo, Wiley and Larson exchanged at least 20 emails concerning Ammo's

21  business and were both copied on at least 20 additional emails, and during that

22  period Wagenhals and Larson exchanged at least 10 emails and were both copied

23  on numerous additional messages.  The exchanged messages included (1) an email

24  from Wiley to only Larson with a copy of Ammo's financial projections; (2)

25  Larson's acceptance of Wiley's invitation to an August 17th call with one of

26  Ammo's lenders; (3) an email from Ammo's investor relations firm to Wiley

27  telling Wiley that they had confirmed with Larson that a press release would be

28  going out pre-market the next day; and (4) an email from Wiley to only Larson

forwarding him a copy of the draft representation letter to the auditor.  Further, in the week after the representation letter, between August 20, 2020, and August 26, 2020, Wagenhals and Larson exchanged nearly three dozen emails concerning Ammo; and Wiley and Larson exchanged more than fifty emails concerning Ammo.

39.     Wagenhals and Wiley were at all relevant times aware of Larson's continued employment with Ammo and his substantial job responsibilities and seniority at the company, and they had consistent and substantive communications with Larson about his work.  In reality, aside from absenteeism or leaves of absence, Larson never actually separated from Ammo and remained employed as a *de facto* executive officer until at least his formal separation in November 2022. Indeed, Larson received semi-monthly paychecks of executive-level salary on each Ammo payday between June 2020 and November 2022.

40.     Among other acts to conceal Larson's role, Wiley directed others to prepare, and participated himself in preparing, false and misleading documents to support the false representations being made to outside auditors.  For example, Wiley texted In-House Counsel, who, despite his law license being suspended, was serving in a capacity similar to in-house counsel, about removing Larson from the list of individuals working on the late-2020 secondary offering described above in order "to save my ass."  After that, Wiley, Larson, and In-House Counsel worked to create a backdated separation agreement to support Larson's purported departure from the company, so Wiley could "have cover with [Audit Firm #1] until they [were] fired."  Nevertheless, Larson was still working at Ammo on important business operations, including, at that time, a late-2020 securities offering.  On November 13, 2020, Wiley texted In-House Counsel, to inform him that Audit Firm #1 had again requested Wiley and Wagenhals to make representations about Larson's role, to which In-House Counsel responded, "F*** them. Get K filed and fire their a** as soon as uplisting happens," referring to firing Audit Firm #1.

41.     Between approximately November 2020 and April 2021, when Ammo fired Audit Firm #1, Wiley made additional false representations to Audit Firm #1 that falsely indicated Larson was not then working at Ammo, including by sending to Audit Firm #1the fabricated separation agreement described in paragraph 40.

42.     After Ammo engaged Audit Firm #2 in or around April 2021, Wagenhals and Wiley made additional false or misleading statements to the new audit firm that had the purpose and effect of minimizing Larson's actual responsibilities, including telling Audit Firm #2 that Larson had been "terminated and rehired in an operational capacity," and that Larson was "no longer involved in the financial function of the Company."  Such statements were made soon after Larson had led Ammo's negotiations to acquire GunBroker.com in early 2021.

43.     As part of the negotiations for the merger with GunBroker.com, Wagenhals hid important information about Larson, including his prior disciplinary history.  For example, although Larson was listed as one of four Ammo "Key Employees" in the merger agreement, which was signed by Wagenhals, the merger agreement provided that:

> To Parent's [Ammo's] knowledge, none of the Key Employees or directors of Parent has been . . . (iii) subject to any order, judgment or decree (not subsequently reversed, suspended, or vacated) of any court of competent jurisdiction permanently or temporarily enjoining him or her from engaging, or otherwise imposing limits or conditions on his or her engagement in any securities, investment advisory, banking, insurance, or other type of business or acting as an officer or director of a public company. . . .

Thus, despite being a Key Employee whose knowledge was imputed to Ammo, the merger agreement did not disclose Larson's disciplinary history, the Larson Court Judgment, or the SEC Suspension.

44.     As part of its Restatement, Ammo disclosed that Larson was an executive officer for FY 2022 and 2023, the Larson Court Judgment, the SEC

Suspension, and that the Minnesota Board of Accountancy revoked Larson's certified public accountant certificate.

### D.    Larson's Related Party Transactions

#### 1.    Payment for Ammo Vendor Contract with Larson's Wife's Shares and Hidden Repayment

45.    In late 2020, while Wagenhals and Wiley were representing to Audit Firm #1 that Larson was "not employed by the Company and he will not return as an employee to the Company," Larson entered into several agreements between Ammo and a company based in Canada ("Vendor #1") that required Ammo to make, among other payments to Vendor #1, transfers of Ammo common stock to Vendor #1. Several agreements between Ammo and Vendor #1 described Vendor #1 as providing "consulting services" to Ammo, including related to investor relations, capital introductions, marketing, and advertising. A portion of one agreement described Vendor #1 as providing "Media Awareness" including a targeted message to "refine and amplify [Ammo's] public information, press releases, and other due diligence our team uncovers from publicly available information and continuously flood the channels below with this information to heighten awareness of [Ammo] in the market."

46.    Upon information and belief, around the time Larson engaged Vendor #1, its CEO had been engaged in market manipulation involving the stock of a different company for which he had been providing investor relations and promotional activities. In or about May 2025, Vendor #1's CEO was sanctioned by the Alberta Securities Commission related to this conduct.

47.    On or about January 3, 2021, Larson emailed Wiley and another Ammo manager to convey, in sum and substance, that because Ammo could not issue the needed shares directly to Vendor #1, Larson's wife would transfer the required shares and "then Ammo can issue [wife's first name] . . . shares in return…."

48. On or about January 6, 2021, Larson's wife transferred 200,000 Ammo shares as payment to Vendor #1.

49. Instead of arranging for Ammo to repay Larson's wife directly, Larson directed In-House Counsel to create a shell company called RW Cabo, LLC ("RW Cabo") to accept the shares. In-House Counsel attempted to incorporate that entity in Arizona and listed Larson's father-in-law ("Father-In-Law") as the managing member.

50. On February 1, 2021, Ammo issued 200,000 shares to RW Cabo, which were repayment of the shares provided by Larson's wife.

51. In light of Larson's role as an executive officer and member of Ammo's management, the arrangements for Larson's wife to pay Vendor #1 with her shares and, later, to be repaid through the share issuance to RW Cabo were related party transactions.

52. Later in February 2021, Ammo filed multiple Forms S-3 that purported to describe the agreements between Ammo and Vendor #1 and stated that Ammo had issued shares to Vendor #1. In the filings, Ammo stated that a portion of the shares were assigned to "RW Cabo LLC" and, in one filing, stated "[Father-In-Law] has voting and investment power over the shares held by RW Cabo LLC." Father-In-Law's last name is not Larson. Thus, the filings obscured that RW Cabo was related to Vendor #1 and hid that a Larson entity was being issued a portion of these shares as repayment for his wife's prior share transfer to Vendor #1. The Forms S-3 also represented that "neither the Selling Stockholders [a defined term that included RW Cabo] nor any of their associates or affiliates has held any position office, or other material relationship with [Ammo] in the past three years."

53. Ammo did not disclose in its Form 10-K for FY 2021 the transactions involving the loans of shares from Larson's wife or the arrangements to repay RW Cabo, despite disclosing other related party transactions. But, as discussed below,

Ammo was required to disclose these as related party transactions; in the Restatement, Ammo included the following concerning newly disclosed related party transactions for Larson: "In February 2021, the Company issued 200,000 shares of Common Stock to an entity controlled by an immediate family member of Chris Larson. The shares were issued to pay for services valued at $1,080,000. The Company issued these shares to reimburse Mr. Larson and/or his spouse for providing a third-party service provider with 200,000 shares of the Company's Common Stock in January 2021 through a separate entity."

### 2. Larson Engaged in a Self-Dealing Kickback Scheme

54.    After the acquisition of GunBroker.com, Larson, on behalf of Ammo, negotiated an agreement between Ammo and a payment-processing company (the "Processing Company"), which was owned by Larson's friend and former co-worker, to perform credit card processing services and develop online shopping cart capabilities for Ammo's newly acquired business line.

55.    Larson and the Processing Company entered into an agreement to pay Larson, through a company he controlled called Thomas Lake & Co. ("Thomas Lake"), a portion of the fees Ammo would pay to the Processing Company.  On May 4, 2021, the Processing Company executed a contract with Thomas Lake that provided the Processing Company would pay Thomas Lake a portion of the processing fees collected from Ammo, "in exchange for a successful introduction and entry into a contract between [the Processing Company] and Ammo, Inc. . . ." The agreement negotiated by Larson resulted in Ammo overpaying the Processing Company for its services to enable the Processing Company to pay the extra proceeds to Larson.  This resulted in excess expenses for Ammo.

56.    At the time he negotiated the transactions with the Processing Company, Larson was required to report to Ammo his arrangement with the Processing Company by Ammo's employee handbook, which prohibited outside employment that "in any way create[d] a conflict of interest," and required Larson

to report any outside employment that would "conflict with [Larson's] duties and obligations to" Ammo. Larson failed to report his kickback arrangement with the Processing Company to Ammo.

57. Between June 2022 through March 2024, the Processing Company paid Thomas Lake approximately $814,864, an overpayment by Ammo for the services of the Processing Company.

58. In light of Larson's role as an executive officer and member of Ammo's management, the arrangement for the Processing Company to pay a portion of fees earned from Ammo to Thomas Lake was a related party transaction.

59. As part of its Restatement, Ammo included the following newly disclosed related party transaction for Larson:

> After the initial filings of the Company's Form 10-Ks for the years ended March 31, 2024, 2023 and 2022, the Company was made aware that Chris Larson had received undisclosed payments totaling $814,863 from a vendor with which the Company had a Master Services Agreement and from which the Company received services. The payments were made by this third-party service provider. This third party made payments to Mr. Larson from approximately January 2022 through March 2024 based on a percentage of revenue received in connection with, and as a commission from, services rendered to the Company. Mr. Larson separated as an employee from the Company effective November 4, 2022 and was later engaged as a contractor for approximately six months.

### 3. Building of Manufacturing Facility by Larson's Brother's Company

60. On or about December 18, 2020, Ammo hired a Wisconsin-based company called Larson Building, Inc. ("Larson Building"), which was owned and managed by Larson's brother, to construct a $25 million manufacturing facility for Ammo in Wisconsin.

61. Wagenhals and Wiley both knew that Larson's brother owned and managed Larson Building.

62.    Wagenhals and Wiley selected Larson Building based on Larson's recommendation, without securing bids from other general contractors to construct a new manufacturing facility, and without procuring a resolution of Ammo's board of directors approving the transaction.

63.    Beginning around June 6, 2021, and continuing until November 7, 2022, Ammo paid invoices to Larson Building for the construction of the manufacturing facility, which cumulatively totaled more than $25 million, making payments to Larson Building exceeding $1.4 million in each quarter from the second quarter of FY 2022 through the third quarter of FY 2023.  Throughout that period, Ammo did not disclose in its public filings that its new manufacturing facility was constructed by a related party.

64.    In light of Larson's role as an executive officer and member of Ammo's management, the arrangement with Larson Building was a related party transaction. As discussed below, Ammo was required to disclose the transaction as a related party transaction.  As part of its Restatement, Ammo included the following newly disclosed related party transaction for Larson:

> In December 2020, the Company entered into an agreement with Larson Building to serve as the general contractor for the construction of its Manitowoc, WI manufacturing facility.  Larson Building is wholly owned by the brother of Chris Larson, who was an executive officer of the Company at the time. During the years ended March 31, 2023 and 2022, the Company paid $14,584,805 and $11,221,738, respectively, to Larson Building in connection with this project.

**E.    Additional Misconduct Related to Accounting Decisions**

65.    Between 2020 and 2023, Wiley and Larson, who worked closely with one another on financial matters and filings at Ammo, made or assisted others in making misstatements about the size of many basic, readily ascertainable expenses and costs for Ammo, which resulted in material impacts to Ammo's financial statements filed with the SEC.

66.     First, after Ammo had issued multiple press releases in August and September 2020 announcing that it expected its adjusted earnings before interest, taxes, depreciation, and amortization ("EBITDA") would, for the first time, turn positive, Larson and Wiley learned that Ammo's adjusted EBITDA was not actually positive.  Thereafter, Wiley and Larson had a conversation concerning whether to change the methodology by which Ammo calculated adjusted EBITDA from the methodology used in prior financial reports.  In November 2020, Wiley then changed in a draft of the Form 10-Q the methodology by which Ammo calculated adjusted EBITDA to include an add-back for excise taxes on products sold.  This caused adjusted EBITDA for the quarter to change from being negative $(629,240) to positive $976,521.  Ammo then touted in a press release: "We continue to make further progress with the manufacturing capabilities, infrastructure and capacity improvements deployed in fiscal year 2020 and 2021.  As a result, we achieved our first ever quarter of adjusted EBITDA profitability during the second quarter."  The press release, which Wiley reviewed and approved knowing of the change in methodology, did not disclose that Ammo had changed its adjusted EBITDA methodology.

67.     Second, between June 2021 and June 2023, Wiley deviated from Ammo's publicly stated methodology of calculating the expense for shares issued as compensation for goods or services, which was disclosed to be on the basis of the closing fair market value of Ammo's common stock on the date of grant.  Instead, Wiley calculated Ammo's stock-compensation expense by using prices associated with various restricted stock transactions occurring at various points during or proximate to those fiscal years or by using other valuation methods.  Under GAAP requirements, share-based payment arrangements (such as issuing stock for executive compensation) should be measured at the fair value of the stock issued.  Accounting rules further provide that the quoted price on a securities exchange (*e.g.*, Nasdaq) provides the most reliable evidence of the fair

COMPLAINT                                21

1  value of that stock.  By using incorrect reference prices, which were often

2  significantly discounted from the applicable closing market price on the grant date,

3  combined with a failure to consider the appropriate grant date for each stock

4  issuance, Wiley caused Ammo to understate stock-compensation expenses by

5  approximately $4.2 million in FY 2021 and $4.1 million in FY 2023.

6         68.    Moreover, Wiley was keenly aware of the deviation in his stock-

7  compensation methodology, as he explained in multiple memos to Ammo's

8  auditors his actual methodology, including that "the Company often looks to the

9  nearest sale of restricted common stock to ascertain a compensation value."  Wiley

10  also ignored reports made to him that his methodology was wrong and deviated

11  from Ammo's disclosed policy.  On or about April 13, 2023, an investor raised

12  concerns to the Ammo Board of Directors about Ammo's method for calculating

13  stock-compensation expense.  The investor noted that Ammo did not appear to

14  have followed its disclosed method for valuing stock-compensation expense—*i.e.*,

15  "based on the closing fair market value of [Ammo's] Common Stock on the date of

16  grant."  And the investor characterized the potential error as a "serious problem

17  that demands immediate action by the Board (especially the Audit

18  Committee)."  Ammo's Audit Committee chair forwarded this email to Wiley on

19  April 13, 2023.

20         69.    After Wiley left the company, Ammo acknowledged stock-

21  compensation expense errors in its Restatement.  It disclosed that it "previously

22  accounted for stock-based payments using a grant date fair value that was

23  discounted from the fair value under the incorrect interpretation that the shares

24  were restricted.  In addition, the determination of the grant date was incorrectly

25  determined with respect to historically issued stock-based payments."

26         70.    Third, Larson provided false information about other expenses Ammo

27  had incurred between 2020 and 2022 in order to allow Ammo to, without a basis,

28  capitalize certain expenditures, resulting in Ammo materially under-reporting its

COMPLAINT                                    22

expenses.  Specifically, for two purported investor relations firms paid by Ammo, Vendor #1 (described above) and "Vendor #2," Larson falsely provided information that the firms had assisted with specific stock offerings, when they had not.  By providing misleading information and documentation, Larson caused Ammo, for FY 2021, to understate certain expenses by approximately $1,005,000 for amounts paid to Vendor #1, and for FY 2022, to understate certain expenses by approximately $5,752,500 for amounts paid to Vendor #1 and Vendor #2.

71.    After the Defendants left the company, Ammo acknowledged these inaccuracies in its Restatement, noting that certain capitalized costs should have been expensed as incurred in general and administrative expenses in the consolidated statement of operations.

## II.    Wagenhals and Wiley Made Materially False and Misleading Statements, and Wiley and Larson Aided and Abetted Ammo Making Materially False and Misleading Statements.

72.    In Ammo's public filings and press releases, which Defendants knew would be available to, and relied upon by, existing and potential Ammo investors, Wagenhals and Wiley made, and Wiley and Larson aided and abetted Ammo in making, certain materially false and misleading statements in violation of Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5(b) of the Exchange Act thereunder [17 C.F.R. § 240.10b-5(b)].

73.    The materially false and misleading statements and omissions concerned (a) Larson's role as *de facto* executive officer of Ammo; (b) related party transactions involving Larson and his family members; (c) Ammo's net income or loss, which was misstated based on improperly capitalizing expenses and mishandling stock-compensation expenses; and (d) a press release misrepresenting that Ammo achieved positive adjusted EBITDA "as a result of" operational improvements.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**A.    Wagenhals and Wiley Made False and Misleading Statements About Larson's Role as a *De Facto* Executive Officer Role and Compensation.**

74.    Between in or about June 2020 and July 2023, Wagenhals and Wiley made materially false and misleading statements about the identities of Ammo's executive officers and their compensation in numerous public filings that purported to describe the executive officers and senior leaders of Ammo, including the following.

75.    First, Ammo's Form 10-K filed on August 19, 2020 included a table under "Item 10" concerning "Directors and Executive Officers and Corporate Governance," that purported to "set[] forth the names and ages of our current directors and executive officers."  The table listed three executive officers: Wagenhals as CEO, Wiley as CFO, and another person as COO.  Ammo's Form S-1 registration statement filed on September 15, 2020 contained a similar table disclosing the same three executive officers, and Ammo's Forms 10-K filed on June 29, 2021 and June 29, 2022 contained substantially similar statements and tables that listed Wagenhals as CEO, Wiley as CFO, and another individual for each year holding the position of COO or "President."  Each of the filings also provided biographical information for the disclosed individuals who remained employed on the date of the filing.

76.    A reasonable investor would have understood from each of these statements that the individuals disclosed were all of Ammo's executive officers and that Larson was not an executive officer of Ammo during the reported periods.

77.    Second, Ammo's Form 10-K issued on August 19, 2020, also included a table under "Item 11" concerning "Executive Compensation" that purported to "set[] forth for the year ended March 31, 2020, and March 31, 2019, information with respect to compensation for services in all capacities to us and our subsidiaries earned by the Company's Chief Executive Officer and all other

executive officers of the Company and any employee of the Company whose cash compensation exceeded $100,000.  We refer to these executive officers as our 'named executive officers.'"  The table included the name, "principal position," and compensation information for Wagenhals, Wiley, and a person listed as COO. Ammo's Form S-1 issued on September 15, 2020 contained the same table.

78.    A reasonable investor would have understood from these statements the individuals listed were all employees earning over $100,000 per year, that Larson was not an executive officer of Ammo during the reported periods, and that Larson's cash compensation did not exceed $100,000 for FY 2019 or FY 2020.

79.    Third, Ammo's Form 10-K issued on June 29, 2021 included a table under "Item 11" concerning "Executive Compensation" that purported to "set[] forth for the year ended March 31, 2021, and March 31, 2020, information with respect to compensation for services in all capacities to us and our subsidiaries earned by the Company's Chief Executive Officer and our two most highly compensated executive officers of the Company whose cash compensation exceeded $100,000.  We refer to these executive officers as our 'named executive officers.'"  The table included the name, "principal position," and compensation information for Wagenhals, Wiley, and a person listed as COO.  Ammo's Form 10-K issued on June 29, 2022, and Form 10-K/A issued on July 31, 2023, contained substantially similar statements and tables that included compensation information for various identified executive officers for various fiscal years, none of whom were Larson.  In addition, Ammo's Form 10-K/A issued on July 31, 2023, stated: "The Company did not have more than three (including the CEO and CFO) executive officers in any of the years ended March 31, 2023, 2022 and, 2021."

80.    A reasonable investor would have understood from these statements that Larson was not an executive officer of Ammo for FY 2021, 2022, or 2023, that Larson was not one of Ammo's three most highly compensated executive

officers during those periods, and that Ammo did not have more than three executive officers during the reported periods.

81.   The lists and tables identifying the executive officers of Ammo and their compensation were false and misleading because Larson was an executive officer at all relevant times during each of Ammo's fiscal years from 2019 to 2023, because Ammo had more than three executive officers during FY 2021, 2022, and 2023, because Larson's cash compensation in FY 2020 was at least $175,000, and because Larson was one of the two most highly compensated executive officers aside from Wagenhals during FY 2021, 2022, and 2023.

82.   The foregoing statements and tables concerning the executive officer roles, identities, background, and compensation were material to investors because the identity of executive management and leadership of a company and their compensation would be important to a reasonable investor, particularly given Larson's background and prior disciplinary and adjudicatory proceedings.

83.   Wagenhals and Wiley knew or were reckless in not knowing the foregoing statements were false and misleading because they worked with Larson and knew his actual responsibilities and role at Ammo, they knew of the identities and roles of other Ammo executive officers, they reviewed and signed the statements referred to above, and they were aware of or had access to Larson's compensation information and compensation for other Ammo executive officers.

84.   Wagenhals and Wiley determined the content of and had ultimate authority over these statements including because they, as CEO and CFO, respectively, prepared, signed, and certified the accuracy of the Forms 10-K filed on August 19, 2020, June 29, 2021, and June 29, 2022; because Wagenhals and Wiley prepared and signed, in various capacities, the Form S-1 registration statement filed on September 15, 2020, and were appointed to make amendments to the registration statement by Ammo's board; and because Wiley prepared, signed, and certified the accuracy of the Form 10-K/A filed on July 31, 2023.

**B.    Wagenhals and Wiley Made False and Misleading Statements About the Absence of Prior Disciplinary Proceedings for Ammo's Executive Officers.**

85.    Between in or about June 2020 and June 2022, Wagenhals and Wiley made materially false and misleading statements that during the prior ten years none of Ammo's executive officers had been subject to certain disciplinary proceedings, including the following.

86.    Ammo's Form 10-K issued on August 19, 2020 stated, under a subsection of "Item 10" titled "Legal Proceedings" that "[d]uring the past ten years, none of our current directors or executive officers has been . . . subject to any order, judgment or decree, not subsequently reversed, suspended or vacated, of any court of competent jurisdiction, permanently or temporarily enjoining, barring, suspending or otherwise limiting his involvement in any type of business, securities or banking activities" or "subject of, or a party to, any order, judgment, decree or finding, not subsequently reversed, suspended or vacated, relating to an alleged violation of a federal or state securities or commodities law or regulation, law or regulation respecting financial institutions or insurance companies, law or regulation prohibiting mail or wire fraud or fraud in connection with any business entity." Ammo's Form S-1 filed on September 15, 2020, and Forms 10-K filed on June 29, 2021, and June 29, 2022, contained the same or substantially similar statements about the absence of legal proceedings against its executive officers.

87.    The foregoing and substantially similar statements were false when made because since at least 2017 Larson had been an executive officer of Ammo and after June 3, 2020, Larson was subject to the Larson Court Judgment, which was a judgment of a court enjoining, barring, suspending or otherwise limiting Larson's involvement in a type of business, securities or banking activities, and the SEC Suspension, which was an order or decree relating to an alleged violation of a federal or state securities law or regulation.

88.    The statements regarding the absence of prior legal proceedings and absence of adverse disciplinary history for Ammo's executive officers were material because the disciplinary background of a company's management and whether there are restrictions on the activities that executives can perform, as well as whether adverse findings or sanctions have been imposed by government or disciplinary authorities, would be important to a reasonable investor.

89.    Wagenhals and Wiley knew or were reckless in not knowing the foregoing statements were false and misleading because they worked with Larson and knew his actual responsibilities and role at Ammo, they reviewed or signed the statements referred to above, and they were aware of the Larson Court Judgment and SEC Suspension.

90.    Wagenhals and Wiley determined the content of and had ultimate authority over the statements including because they, as CEO and CFO, respectively, prepared, signed, and certified the accuracy of the Forms 10-K issued on August 19, 2020, June 29, 2021, and June 29, 2022; and because Wagenhals and Wiley prepared and signed, in various capacities, the Form S-1 registration statement filed on September 15, 2020, and were appointed to make amendments to the registration statement by Ammo's board.

### C.    Wagenhals and Wiley Made False and Misleading Statements about Related Party Transactions.

91.    SEC-registered entities like Ammo must disclose their related party transactions.  The obligation to do so arises from, among other requirements: (1) SEC regulations, and (2) Generally Accepted Accounting Principles ("GAAP").

92.    SEC regulations require disclosure of a company's related party transactions in its Forms 10-K.  Item 404(a) of Regulation S-K [17 C.F.R. § 229.404(a)] generally requires the disclosure of past or proposed future transactions exceeding $120,000 with "related persons" if the company is a participant and the related person has a direct or indirect material interest in the

transaction.  For purposes of Regulation S-K, related persons include, among others, any director or executive officer of the registrant, and any immediate family member of the director or executive officer of the registrant, including spouses and siblings.

93.    GAAP, which governed the preparation of Ammo's financial statements, requires the disclosure of material related party transactions in an entity's financial statements.  The financial statement disclosure must describe the transaction in question, the nature of the relationship, the dollar amount of the transaction, and the amounts due from or to related parties.  Under GAAP, related parties of an entity include management of the entity and members of their immediate families.  The Financial Accounting Standards Board Codification Master Glossary defines "management" as persons who are responsible for achieving the objectives of the entity and who have the authority to establish policies and make decisions by which those objectives are to be pursued. Management normally includes members of the board of directors, the chief executive officer, chief operating officer, vice presidents in charge of principal business functions (such as sales, administration, or finance), and other persons who perform similar policy making functions.  Persons without formal titles also may be members of management.

94.    Between at least 2020 and 2023, Ammo listed related party transactions in at least two portions of its SEC disclosures: (1) in Item 13 of Form 10-K; and (2) in the "Notes" to its financial statements that were part of Ammo's Forms 10-K and Forms 10-Q.  Ammo's Forms 10-K and Forms 10-Q further included representations indicating that Ammo's financial statements had been prepared in accordance with GAAP and SEC regulations.  For example, in Ammo's Forms 10-K under headings such as "Critical Accounting Policies," the filings made statements like the following: "Our discussion and analysis of our financial condition and results of operation are based upon our financial

statements, which have been prepared in accordance with GAAP." In addition, in Forms 10-Q, the filings stated:

> The accompanying unaudited condensed consolidated financial statements and related disclosures included in this Quarterly Report on Form 10-Q have been prepared in accordance with accounting principles generally accepted in the United States of America ("U.S. GAAP") and reflect all adjustments, which consist solely of normal recurring adjustments, needed to fairly present the financial results for these periods. Additionally, these condensed consolidated financial statements and related disclosures are presented pursuant to the rules and regulations of the Securities Exchange Commission ("SEC").

### i. Wagenhals and Wiley Made False and Misleading Statements and Omissions by Not Disclosing the Larson Building Transaction.

95. Between in or about June 2021 and August 2022, Wagenhals and Wiley made materially false and misleading statements and omissions by not disclosing the Larson Building transaction as a related party transaction in either Ammo's Forms 10-K or in the financial statements attached to the Forms 10-K and Forms 10-Q, including the following.

96. First, Ammo's Forms 10-K filed on or about June 29, 2021, and June 29, 2022, under "Item 13," concerning "Certain Relationships and Related Transactions, and Director Independence," included a section entitled "Related Party Transactions," which represented that, other than the listed transactions, "none of the directors or executive officers of the Company, nor any person who owned of record or was known to own beneficially more than 5% of the Company's outstanding shares of its Common Stock, nor any associate or affiliate of such persons or companies, has any material interest, direct or indirect, in any transaction that has occurred during the past fiscal year, or in any proposed transaction, which has materially affected or will affect the Company." The list of

related party transactions included under Item 13 did not include the transaction with Larson Building.

97.    Second, the Notes to Ammo's financial statements that were purported to be issued under GAAP and were included in Ammo's Forms 10-K issued on June 29, 2021, (in "Note 15") and June 29, 2022, (in "Note 17") listed "Related Party Transactions."  The lists of related party transactions did not include the transaction with Larson Building.  In addition, each of Ammo's Forms 10-Q filed on February 12, 2021, August 16, 2021, November 15, 2021, February 14, 2022, and August 15, 2022 included representations that the financial statements and related disclosures had been prepared in accordance with GAAP and the rules and requirements of the SEC.  But the financial statements included in the Forms 10-Q did not include the disclosure of related party transactions including the related party transaction with Larson Building.

98.    A reasonable investor would have understood from these statements that all related party transactions were disclosed, that there were no related party transactions involving Larson, and that Ammo's financial statements concerning related party transactions complied with the requirements of GAAP and the requirements of the SEC.

99.    The foregoing and substantially similar statements were false and misleading and omitted required information when made because, among other reasons, Larson was during each of FY 2021 and FY 2022 an executive officer of Ammo and a member of management under GAAP, Larson was a related party under Regulation S-K and under GAAP, the transaction involving Larson Building was a related party transaction under Regulation S-K and GAAP, and the Larson-Building-transaction's related-party status was withheld from both annual and quarterly reports.

100.   The foregoing statements regarding related party transactions were material to investors because accurate information about related party transactions

would be relevant to determining whether Ammo engaged in transactions that involved actual or potential conflicts of interest and, if so, the size of such transactions and their purpose, and because whether a company's financial statements and SEC filings were prepared in accordance with SEC regulations and GAAP would impact the reliability of the statements in those filings, and, as such, would be important to a reasonable investor.

101.    Wagenhals and Wiley knew or were reckless in not knowing that the foregoing statements that did not disclose the Larson Building transaction as a related party transaction were misleading because they worked with Larson, knew Larson's actual responsibilities and role at Ammo, knew that Ammo's SEC reports and financial statements required the disclosure of related party transactions, and were aware of information about Larson's involvement in the Larson Building transaction, including that the builder of the manufacturing facility in Wisconsin was owned by Larson's brother.

102.    Wagenhals and Wiley determined the content of and had ultimate authority over these statements including because they, as CEO and CFO, respectively, prepared, signed, and certified the accuracy of the Forms 10-K filed on June 29, 2021, and June 29, 2022, and the Forms 10-Q filed on February 12, 2021, August 16, 2021, November 15, 2021, February 14, 2022, and August 15, 2022.

### ii.    Wiley Made False and Misleading Statements by Not Disclosing the Payment of Shares from Larson's Wife and RW Cabo Repayment.

103.    In or about June 2021, Wiley made materially misleading statements by not disclosing in Ammo's Form 10-K or the attached financial statements the related party transactions for the payment of shares to Vendor #1 from Larson's wife and the repayment of those shares through RW Cabo, including the following.

104.    Ammo's Form 10-K issued on or about June 29, 2021, under "Item 13," concerning "Certain Relationships and Related Transactions, and Director Independence," included a section entitled "Related Party Transactions," which represented that other than the listed transactions, "none of the directors or executive officers of the Company, nor any person who owned of record or was known to own beneficially more than 5% of the Company's outstanding shares of its Common Stock, nor any associate or affiliate of such persons or companies, has any material interest, direct or indirect, in any transaction that has occurred during the past fiscal year, or in any proposed transaction, which has materially affected or will affect the Company."  The list of related party transactions included under Item 13 did not include the arrangement to pay Vendor #1 with shares from Larson's wife or the arrangement to repay RW Cabo, including as described above.

105.    In addition, the notes to Ammo's financial statements that were purported to be issued under GAAP and were included in Ammo's Form 10-K issued on June 29, 2021, listed "Related Party Transactions."  The lists of related party transactions did not include the arrangement to pay Vendor #1 with shares from Larson's wife or the arrangement to repay RW Cabo.

106.    A reasonable investor would have understood from these statements that all related party transactions were disclosed and that there were no related party transactions involving Larson's wife paying an Ammo vendor or Ammo issuing stock to repay Larson's wife through a company controlled by Larson.

107.    The foregoing and substantially similar statements were misleading when made because, among other reasons, Larson was during FY 2021 an executive officer of Ammo and a member of management under GAAP, Larson was a related party under Regulation S-K and under GAAP, the arrangement for Larson's wife to pay Vendor #1 was a related party transaction under Regulation S-K and GAAP, and the issuance of shares for RW Cabo to repay Larson's wife was a related party transaction under Regulation S-K and GAAP.

108.   The foregoing statements regarding related party transactions were material to investors because accurate information about related party transactions would be relevant to determining whether Ammo engaged in transactions that involved actual or potential conflicts of interest and, if so, the size of such transactions and their purpose, and because whether a company's financial statements and SEC filings were prepared in accordance with SEC regulations and GAAP would impact the reliability of the statements in those filings, and, as such, would be important to a reasonable investor.

109.   Wiley knew or was reckless in not knowing that the foregoing statements that did not disclose the arrangement for Larson's wife to pay Vendor #1 or the share issuance to RW Cabo as related party transactions were false and misleading because he worked with Larson, knew Larson's actual responsibilities and role at Ammo, knew about the arrangement with Vendor #1 to receive payment from shares owned by Larson's wife, and knew about the share issuance to RW Cabo, including that it was intended to benefit Larson or Larson's wife.

110.   Wiley determined the content of and had ultimate authority over the statements including because he, as CFO, prepared, signed, and certified the accuracy of the Form 10-K filed on June 29, 2021.

**D.    Wiley Made Materially False and Misleading Statements Related to Stock Compensation and Net Income or Loss**

111.   Between in or about June 2021 and June 2023, Wiley made one or more materially false or misleading statements about Ammo's stock-compensation expense and net income or loss, including the following.

112.   First, Ammo's Form 10-K and Form 8-K (in the attached press release and financial results), filed or furnished on June 29, 2021, reported a net loss of $(7,812,294) for FY 2021.

113.    Second, Ammo's Form 10-K and Form 8-K (in the attached press release and financial results), filed or furnished on June 14, 2023, reported a net loss of $(4,596,038) for FY 2023.

114.    Third, Ammo's Forms 10-K issued on June 29, 2021 and June 14, 2023, stated as to Ammo's stock compensation:

> We grant stock-based compensation to key employees and directors as a means of attracting and retaining highly qualified personnel.  We also grant stock in lieu of cash compensation for key consultants and service providers.  We recognize expense related to stock-based payment transactions in which we receive employee or non-employee services in exchange for equity.  We measure stock compensation based on the closing fair market value of our Common Stock on the date of grant.

115.    The foregoing and substantially similar statements were false or misleading when made because for at least FY 2021 and FY 2023, Wiley calculated Ammo's stock-compensation expense by reference to prices associated with sales of restricted stock or other stock transactions.  By using incorrect reference prices, which were often significantly discounted from the applicable closing market price on the grant date, combined with a failure to consider the appropriate grant date for each stock issuance, Wiley caused the calculation of the expenses associated with stock-based payment transactions to be understated by approximately $4.2 million in FY 2021 and $4.1 million in FY 2023.

116.    These statements regarding the company's net loss and methodology for calculating stock-based compensation expense were false and misleading when made because (a) Ammo's stock-compensation expenses for FY 2021 were understated by approximately $4,192,414; (b) Ammo's actual net loss was at least $4,192,414 more than reported for FY 2021; (c) Ammo's stock-compensation expenses for FY 2023 were understated by approximately $4,141,363; (d) Ammo's actual net loss was at least $4,141,363 more than reported for FY 2023, and (e)

because Ammo did not calculate its stock-compensation expense based on the closing fair market value of Ammo's common stock on the date of grant.

117.   The above false and misleading statements of Ammo's financial results, including its stock-based compensation expenses and its net losses were material because Ammo's original reported net loss for FY 2021 was $(7,812,294) and the actual net loss was at least 53% greater than reported due to stock-based compensation expenses; Ammo's original reported net loss for FY 2023 was $(4,596,038) and the actual net loss was at least 90% higher than reported due to stock-based compensation expense; and reporting accurate financial results and figures, including revenues, expenses, losses, and gains, and the accuracy of the methodologies used for those reports would be important to a reasonable investor.

118.   Wiley knew, or was reckless in not knowing, that the statements about how Ammo calculated its stock-compensation expense and the calculations themselves were false and misleading because he was a trained CPA, had access to all relevant information about Ammo's calculation of its stock-compensation expense, prepared paperwork for the stock-compensation grants and public reports about it, calculated Ammo's stock-compensation expense, reported to Ammo's auditors a different methodology than was contained in Ammo's public reports, and signed the statements referred to above.

119.   Wiley determined the content of and had ultimate authority over the statements including because he as CFO prepared and signed the Form 10-K and Form 8-K filed or furnished on June 29, 2021, and signed the Form 10-K and Form 8-K filed or furnished on June 14, 2023.

### E.    Larson Aided and Abetted Ammo's False and Misleading Reporting of Expenses.

120.   During its 2021 and 2022 fiscal years, Ammo engaged Vendor #1 and Vendor #2 to provide purported investor-relations services.  It made payments of cash and shares to Vendor #1 and Vendor #2.  Under GAAP, these payments for

1    general investor relations and other services should have been recorded as

2    expenses that reduced Ammo's net income (or increased Ammo's net loss).

3        121.    Ammo made false and misleading statements by improperly

4    recharacterizing, in a manner inconsistent with GAAP, expenses paid to Vendor #1

5    and Vendor #2 as costs incurred in connection with stock offerings or debt or

6    equity issuances.  This recharacterization improperly reduced Ammo's reported

7    expenses on its income statements (and transferred them to its balance sheet).  The

8    false and misleading statements included the following.

9        122.    First, Ammo's Form 10-K and Form 8-K (in the attached press release

10   and financial results), filed or furnished on June 29, 2021, reported a "Net Loss" of

11   $(7,812,294) and the Form 10-K reported "Corporate general and administrative"

12   expense of $7,191,544 for FY 2021.

13       123.    Second, Ammo's Form 10-K and Form 8-K  (in the attached press

14   release and financial results) filed or furnished on June 29, 2022, reported net

15   income of $33,247,436 for FY 2022.  These forms also stated that Ammo's

16   "Corporate general and administrative" expenses were $16,986,344 for FY 2022.

17       124.    These statements regarding the company's net income or loss and

18   contributing expenses were false and misleading when made because (a) for FY

19   2021, Ammo understated its corporate general and administrative expenses by

20   approximately $1,005,000 for amounts paid to Vendor #1; (b) for FY 2022, Ammo

21   understated its corporate general and administrative expenses by approximately

22   $5,752,500 for amounts paid to Vendor #1 and Vendor #2; (c) Ammo's net loss for

23   FY 2021 was understated by at least $1,005,000; and (d) Ammo's net income for

24   FY 2022 was overstated by at least $5,752,500.

25       125.    The above false and misleading statements of Ammo's financial

26   results, including its expenses and net losses were material because this caused

27   Ammo's FY 2021 net loss to be understated by at least 12.86%, and caused

28   Ammo's FY 2022 net income to be overstated by at least 17.3%.  Moreover,

Ammo reporting accurate financial results and figures, including revenues, expenses, losses, and gains, would be important to a reasonable investor.

126.    Larson knowingly or recklessly provided substantial assistance to Ammo in making the false statements, improperly reducing its reported expenses, and inflating its net income, including by the following:

(a)    Prior to the filing of the Form 10-K and Form 8-K for FY 2021, Larson represented falsely to Wiley that Vendor #1's services directly related to Ammo's Series A preferred stock offering that closed in May 2021, rather than general investor relations services.  This was false as Vendor #1 did not perform any work directly related to that securities offering.

(b)    In approximately mid-2021, Larson arranged for Vendor #1 to send altered invoices falsely stating that the firm provided services in connection with Ammo's offering of preferred stock.

(c)    Also in approximately mid-2021, Larson sent Wiley a supposed agreement between Vendor #1 and Ammo stating that Vendor #1 would provide services related to the Series A preferred stock offering that closed in May 2021. The supposed agreement contained a typewritten signature for Vendor #1's CEO that, upon information and belief, was forged.

(d)    Larson also represented falsely to Wiley that Vendor #2's services directly related to assisting Ammo's investment bankers in debt and equity raises.

(e)    In approximately June 2021, Larson sent Wiley a purported agreement between Ammo and Vendor #2 that indicated that, among other things: "Consultant will facilitate contact with advisors, business professionals, as well as potential individual investors, family offices, money managers, RIA's, funds, research analysts and retail brokerage firms" and would support other firms "in current and future debt and equity raises."  This was false as Vendor #2 did not perform such work.

127.   Larson knew, or was reckless in not knowing, that the information he provided about expense capitalization based on the treatment of the payments to Vendor #1 and Vendor #2 would cause Ammo to make false and misleading statements in its financial reports because he was trained as and previously certified as a CPA, he had worked as a CFO at public companies, he had substantial involvement with Ammo's financial functions, he knew of the actual services provided by Vendor #1 and Vendor #2, and knew that discrepancies in the services reported would be used to recharacterize the certain expenses.

128.   Larson's scienter is imputed to Ammo.

**F.    Wiley Aided and Abetted Ammo's False and Misleading Statement in a Press Release About Achieving Positive Adjusted EBITDA for the Quarter Ending September 30, 2020.**

129.   In or around November 2020, Ammo made a materially false and misleading statement about its adjusted EBITDA, and Wiley substantially assisted Ammo's misstatement.

130.   Ammo reported an adjusted EBITDA figure, a non-GAAP performance metric, in each of its Forms 10-K and 10-Q from July 2019 to September 2022.

131.   On August 25, 2020, Ammo announced that it expected to have positive adjusted EBITDA for the first time in its history, a message it reiterated on September 28, 2020, when the company stated in a press release, in part: "In addition, we continue to expect that we will achieve positive adjusted EBITDA at the end of our fiscal second quarter as we remain committed to prudently managing expenses through restructuring efforts."

132.   In late September and early October 2020, the investor-relations firm Ammo used asked Wagenhals, Larson, and Wiley, among others, for "approximate bottom line numbers (net income and adjusted EBITDA) to show we hit our guidance of being adjusted EBITDA positive in fiscal Q2?"  After Larson provided

sales figures, a member of the investor-relations firm followed up: "[E]veryone knows your sales are doing well, but they want to see you achieve profitability in a record demand environment.  Given that we've reiterated that we are going to be adjusted EBITDA positive in fiscal Q2 several times now (including the most recent PR from 9/28), I'm assuming this still holds true?  We'll want to provide this along with a net income number since you have to provide the nearest comparable GAAP measure."  Although Larson replied that "We only have top line revenue at this moment," just four days later, Ammo issued another press release stating: "We also remain on track to achieve positive adjusted EBITDA in the fiscal second quarter as we maintain our focus on prudent cost management while driving sales for our higher margin product offerings."  Wiley received these communications.

133.   On or about October 26, 2020, Wiley emailed In-House Counsel draft financial statements showing negative adjusted EBITDA for the quarter ending September 30, 2020, which was inconsistent with the three Ammo press releases discussed above.  In the calculation Wiley sent, an adjustment for the amount of excise tax paid by Ammo (which is a tax levied on certain sales and eventually remitted to the government from revenue) was not reflected in the calculation of Ammo's adjusted EBITDA, which was consistent with how Ammo had previously reported this non-GAAP metric in its SEC filings.  Wiley also emailed a draft Form 10-Q for the previous quarter that contained the same calculation showing negative adjusted EBITDA to Audit Firm #1.

134.   Between on or about October 26, 2020, and November 5, 2020, Larson and Wiley had one or more conversations concerning whether to change the methodology by which Ammo calculated adjusted EBITDA from the methodology used in prior financial reports.

135.   After Audit Firm #1 provided "initial comments on the Q," on November 5, 2020, Wiley sent back to Audit Firm #1 a revised draft of the Form

10-Q that included a revised table where $1,505,693 of excise taxes were added back to Ammo's net loss as part of the adjusted EBITDA calculation. This caused adjusted EBITDA to change from negative $(629,240) to positive $976,521.

136.    On or about November 12, 2020, Ammo issued guidance that again indicated that it would report positive adjusted EBITDA.

137.    On or about November 13, 2020, Ammo issued its Form 10-Q with the revised adjusted EBITDA calculation in which excise taxes were added back to Ammo's net loss, resulting in a reported positive adjusted EBITDA. The Form 10-Q added to the language that Ammo had used in prior filings when discussing adjusted EBITDA: "and we have included [sic] adjustment for excise taxes."

138.    On or about November 15, 2020, Larson sent a press release prepared by himself and In-House Counsel to Wiley and wrote, "Rob please review and make your changes then set it up to go out. But I want to talk to Fred first. So call me at 7 am." Wiley thereafter sent that press release to the publisher.

139.    On or about November 16, 2020, Ammo issued the press release that stated: "We continue to make further progress with the manufacturing capabilities, infrastructure and capacity improvements deployed in fiscal year 2020 and 2021. As a result, we achieved our first ever quarter of adjusted EBITDA profitability during the second quarter." The press release did not disclose that Ammo had changed its adjusted EBITDA calculation methodology.

140.    The statements in the press release were false and misleading because Ammo had not achieved positive adjusted EBITDA using the metrics that it had previously employed for reporting this same financial figure and because the necessary factor required to reach positive adjusted EBITDA was the change in methodology, which was not disclosed in the press release.

141.    The above false and misleading statement about Ammo achieving positive adjusted EBITDA was material because the reasons Ammo achieved positive financial results would be important to a reasonable investor.

142.    Wiley knowingly or recklessly provided substantial assistance to Ammo in making the false press release by changing the methodology that Ammo used to calculate adjusted EBITDA and withholding that information from the press release he reviewed and approved.

143.    Wiley knew, or was reckless in not knowing, that the statements were false and misleading because he was a trained CPA, had access to all relevant information about the calculations for Ammo's adjusted EBITDA, discussed the change in methodology with others, was familiar with Ammo's operational metrics and changes thereto, and prepared and reviewed paperwork reflecting the misleading statement.

144.    Wiley's scienter is imputed to Ammo.

***

145.    Each of the false and misleading statements detailed above was made in connection with the offer, purchase, or sale of securities issued by Ammo.

### III.    Defendants Engaged in Deceptive Acts to Defraud or Mislead Investors.

146.    In addition to the false and misleading statements alleged above, Defendants engaged in multiple deceptive acts in furtherance of schemes to defraud or mislead Ammo's investors in violation of Section 10(b) of the Exchange Act and Rules 10b-5(a) and (c) thereunder and Sections 17(a)(1) and (3) of the Securities Act.  The deceptive conduct included: (1) a scheme by Wagenhals and Wiley to conceal Larson's senior executive role and disciplinary history; (2) a scheme by Wiley to report positive adjusted EBITDA when it had not been achieved; (3) a scheme by Larson to receive kickbacks from the Processing Company contract; and (4) a scheme by Larson to improperly capitalize the expenses paid to Vendor #1 and Vendor #2.

### A.    Wagenhals and Wiley Engaged in Deceptive Conduct in Furtherance of Their Scheme to Conceal Larson's Role as an Executive Officer of Ammo and his Disciplinary History.

COMPLAINT                                    42

147.    Between at least June 2020 and November 2022, Wagenhals and Wiley engaged in a scheme to defraud, and in one or more acts, practices, or courses of business which operated as a fraud or deceit upon another person, to conceal and obfuscate Larson's role as a *de facto* executive officer and member of Ammo's management and his disciplinary history.  In furtherance of this scheme, Wagenhals and Wiley made the false and misleading statements about Larson's role and responsibilities as set forth above, and also made repeated false or misleading representations to Audit Firm #1 and Audit Firm #2 and generated and distributed false and misleading documents, including the following:

(a)    On or about August 13, 2020, Wagenhals falsely told Audit Firm #1 that Larson had quit after an employee of the audit firm had informed employees of Ammo that they would need to perform additional procedures based on learning that Larson was still working at Ammo.  Wagenhals indicated that such an action should allow for Ammo's Form 10-K to be filed quickly: "Based on the conversation that we just had – Chris [Larson] quit.  That holding up this 10-K is too important to the company and its shareholders.  So we decided in the best interest of the company that we part ways.  So now there should be no reason why this 10-K shouldn't be filed today as promised."

(b)    On or about August 19, 2020, Wagenhals and Wiley signed a management representation letter to Audit Firm #1 that, among other matters, falsely stated "Chris Larsen [sic] is currently not employed by the Company and he will not return as an employee to the Company."  That same day, In-House Counsel sent a copy of the false representation letter to Larson, at his Ammo email address, and stated: "Set it up on our letterhead, signed and gave to Rob [Wiley] to send to the a**holes," referring to Audit Firm #1.

(c)    On or about September 11, 2020, Wiley texted In-House Counsel about removing Larson from a list of persons working on a secondary offering, which In-House Counsel suggested Wiley speak with Larson about.

Wiley confirmed he spoke with Larson and wrote: "Ya we talked and he thought I should do that to save my ass but wanted to get another prospective [sic]."  In-House Counsel responded, in part: "and Monday the three of us should sit down and figure out how to create a paper trail about his 'role' now so you and the company have cover with Audit Firm #1 until they are fired."  Wiley responded: "Completely agree…."

(d)      In approximately October 2020, Wiley, Larson, and In-House Counsel worked to create a bogus separation agreement to support Larson's purported departure from the company.  On October 29, In-House Counsel sent an email attaching both a purported separation agreement for Larson and an employment agreement and wrote: "ROB [Wiley]- I need you to pull out the [Audit Firm #1] communications so you can lock in the dates in the Sep Agreement.  Once we three meet, I will lock in the new Emp Agreement dates and we can then deal with the one-on-one Rob/[Audit Firm #1] discussion as we will have all the docs in order to support the process and decision to be addressed, while covering the maintenance on payroll etc."

(e)      On or about November 13, 2020, Wagenhals and Wiley signed a management representation letter on behalf of Ammo that falsely stated Larson was "not employed by the Company and he will not return as an employee to the Company," in connection with Audit Firm #1's review of Ammo's consolidated interim financial statements.  Around that time, Wiley texted In-House Counsel: "They had us rep CL again," referring to the representation about Larson not being employed.  In-House Counsel replied to Wiley: "F*ck them.  Get K filed and fire their ass as soon as uplisting happens snd [sic] we will just have to deal with fallout."  The reference to uplisting was to Ammo's plan for its common stock to trade on the Nasdaq Stock Exchange, which began the following month.  Wiley replied, "Agreed.  They put me through hell today but we are filing right now."

(f)     In approximately November 2020, Wiley provided a false representation to an employee of Audit Firm #1 who had questioned a transfer of shares to Larson by falsely representing, in part, that "[t]he shares were accrued as a result of the attached agreement," and sent a signed version of the bogus separation agreement Wiley, Larson, and In-House Counsel had created that indicated Larson had been terminated on August 20, 2020.

(g)     In approximately January 2021, Audit Firm #1 asked Wiley for an October 16, 2020, agreement between Ammo and Vendor #1. Wiley did not send the previously executed agreement, which Wiley had received when Ammo sent the fully executed agreement to Company #1's CEO.  In that agreement, Larson had signed on behalf of Ammo as "VP Finance."  Instead, Wiley sent Audit Firm #1 a version that swapped out the signature page bearing Larson's signature and title for a signature page drawn from a different agreement.

(h)     On or about February 12, 2021, Wagenhals and Wiley again signed a management representation letter on behalf of Ammo that falsely represented, among other matters, that Larson was "not employed by the Company and he will not return as an employee to the Company."

(i)     In approximately April 2021, Wagenhals and Wiley told one or more employees of Audit Firm #2 that Ammo had terminated Larson and rehired Larson to an operational role, and stated that Larson no longer worked on the financial functions of the business.

(j)     Between 2021 and late-2022, Wagenhals and Wiley signed management representation letters for each quarterly and annual period ended March 31, 2021, to November 14, 2022, that falsely stated that "Larson, formerly employed as the Vice President of Finance, was terminated and rehired in an operational capacity," and was "no longer involved in the financial function of the Company."

(k)     On or about April 28, 2021, Wiley responded to a request from Audit Firm #2 for an organizational chart by falsely stating: "I do not believe we have an employee org. chart," despite having been emailed employee organization charts on or about March 23, 2021, that listed Larson on a page of "executives" and depicted Larson as a high-ranking executive.

(l)     In approximately May 2021, after Audit Firm #2 asked Wiley for copies of Larson's termination agreement and new employment agreement, Wiley responded by sending Audit Firm #2 an incomplete set of agreements between Larson and Ammo detailing Larson's purported terminations and re-hirings. Wiley further stated: "There was a gap from December to March in which he [referring to Larson] still received compensation as Fred and the Company requested his services from time to time and felt it was necessary to maintain the relationship. I have requested his current Employment Agreement from HR and will supplement with that document upon receipt."

(m)     On or about May 20, 2021, Wiley sent to Audit Firm #2 an altered employment agreement for Larson that removed Larson's actual title and changed his supervisor from the CFO to the CEO, in order to avoid giving the appearance that Larson was involved in Ammo's financial functions. Larson had sent Wiley an unsigned version of that agreement which had removed the Vice President of Finance role that appeared in Larson's earlier agreements.

(n)     On or about September 13, 2021, Wagenhals authorized the circulation of a proxy statement from the Ammo Board of Directors to shareholders that provided a misleading statement about the executive officers of Ammo by omitting Larson, his disciplinary history, and compensation.

(o)     In approximately February 2022, after Audit Firm #2 asked Wiley about a $25 million construction contract between Ammo and the company owned by Larson's brother as part of Audit Firm #2's related party audit

procedures, Wiley misleadingly stated: "This is a separate party from Chris Larson."

148.   In light of all of the above-alleged facts, Wagenhals and Wiley knew or were reckless in not knowing, and should have known, that their conduct was deceptive and that it resulted in a material deception.

149.   As alleged above, identifying the actual executive management of a publicly traded company and their compensation and recent disciplinary history would be important to a reasonable investor.

**B.    Wiley Engaged in a Scheme to Artificially Manufacture and Report Positive Adjusted EBITDA.**

150.   In or about November 2020, Wiley engaged in a scheme to defraud and in one or more acts, practices, or courses of business which operated as a fraud or deceit upon another person, to falsely manufacture and report positive adjusted EBITDA for Ammo's quarter ended September 30, 2020.  In furtherance of this scheme, Wiley committed, among others, one or more of the actions set forth above in paragraphs 129 through 144.

151.   In light of the above-alleged facts, Wiley knew or was reckless in not knowing, and should have known, that his conduct was deceptive and that it resulted in a material deception.

152.   As alleged above in paragraph 141, whether and how Ammo had in fact achieved positive adjusted EBITDA was material because the reasons Ammo achieved positive financial results would be important to a reasonable investor.

**C.    Larson Engaged in a Kickback Scheme.**

153.   Between approximately May 2021 and March 2024, including by committing the conduct alleged and described above in paragraphs 54 through 59, Larson engaged in a self-dealing kickback scheme to defraud Ammo and its investors and engaged in one or more acts, practices, or courses of business which operated as a fraud or deceit upon another person, by enriching himself at the

expense of Ammo and its investors, including by dissipating corporate revenues and inflating expenses to fund a kickback arrangement and by entering into an undisclosed contract with the Processing Company to pay one-half of Ammo's credit-card processing fees to Larson.

154.    From June 2022 through March 2024, the Processing Company paid Thomas Lake approximately $814,864.

155.    Thomas Lake, an entity owned and controlled by Larson, would not have received this money but for Larson's participation in the misconduct alleged above.

156.    In light of all of the above-alleged facts, Larson knew or was reckless in not knowing, and should have known, that his conduct was deceptive and that it resulted in a material deception.

157.    The existence of the agreement between the Processing Company and Thomas Lake and the amount of the payments from Thomas Lake to the Processing Company was material because the existence of the agreement between the Processing Company and Thomas Lake was a related party transaction that should have been disclosed by Ammo and the payments to Thomas Lake resulted in Ammo's expenses being unnecessarily inflated from June 2022 through March 2024.

**D.    Larson Engaged in a Scheme to Improperly Capitalize Investor Relations Costs.**

158.    Between approximately January and August 2021, including by committing the conduct alleged and described above in paragraphs 120 through 125, Larson engaged in a scheme to defraud and in one or more acts, practices, or courses of business which operated as a fraud or deceit upon another person to improperly reduce Ammo's reported investor relations expenses and thereby cause Ammo to misrepresent its financial performance.

159.   In order to supply phony paperwork meant to substantiate that the expenses for Vendor #1 could be capitalized, Larson represented falsely to Wiley that Vendor #1's services directly related to Ammo's Series A preferred stock offering that closed in May 2021, rather than general investor relations services. This was false as Vendor #1 did not perform any work directly related to that securities offering.  In addition, Larson arranged for Vendor #1 to send altered invoices falsely stating that the firm provided services in connection with Ammo's offering of preferred stock.

160.   In order to provide the false appearance that expenses for Vendor #2 could be capitalized, Larson represented falsely to Wiley that Vendor #2's services directly related to assisting Ammo's investment bankers in debt and equity raises. Larson also sent Wiley a supposed agreement between Ammo and Vendor #2 that falsely represented that company assisted Ammo's investment bankers in debt and equity raises.  This was false as Vendor #2 did not perform such work.

161.   In light of all of the above-alleged facts, Larson knew or was reckless in not knowing, and should have known, that his conduct was deceptive and that it resulted in a material deception.

162.   As alleged above in paragraph 125, the conduct to influence Ammo's financial results, including its net losses, was material because accurate financial results and figures, including revenues, expenses, losses, and gains, would be important to a reasonable investor.

**IV.   Wagenhals and Wiley Knowingly Lied to Auditors.**

163.   Exchange Act Rule 13b2-2(a) [17 C.F.R. § 240.13b2–2(a)] provides, in part, that no officer of an issuer shall directly or indirectly make or cause to be made a materially false or misleading statement, or omit to state, or cause another person to omit to state, any material fact necessary in order to make statements made, in light of the circumstances under which such statements were made, not

misleading, to an accountant in connection with any audit, review or examination of the financial statements of the issuer or preparation of SEC filings.

164.    Between  August 2020 and August 2022, Wagenhals and Wiley knowingly and intentionally made or caused to be made one or more materially false or misleading statements or omissions to accountants in connection with the audit or review of financial statements or the preparation of SEC filings, including those set forth below:

(a)    On or about August 19, 2020, Wagenhals and Wiley signed a management representation letter to Audit Firm #1 that, among other matters, falsely stated that Larson was "not employed by the Company and he will not return as an employee to the Company," in connection with Audit Firm #1's audit of Ammo's consolidated financial statements.

(b)    On or about November 13, 2020, Wagenhals and Wiley signed a management representation letter on behalf of Ammo that, among other matters, falsely stated Larson was "not employed by the Company and he will not return as an employee to the Company," in connection with Audit Firm #1's review of Ammo's consolidated interim financial statements.

(c)    On or about November 18, 2020, Wiley sent Audit Firm #1 fabricated and misleading documents, including a fabricated separation agreement for Larson, in connection with Audit Firm #1's review of Ammo's consolidated interim financial statements.

(d)    On or about February 12, 2021, Wagenhals and Wiley signed a management representation letter on behalf of Ammo that, among other matters, falsely stated Larson was "not employed by the Company and he will not return as an employee to the Company," in connection with Audit Firm #1's review of Ammo's consolidated interim financial statements.

(e)    On or about April 28, 2021, Wiley emailed one or more employees of Audit Firm #2 that stated, in part: "I do not believe we have an

employee org. chart," in connection with Audit Firm #2's audit of Ammo's consolidated financial statements.

(f)　　On or about February 7, 2022, Wiley responded to Audit Firm #2's request for additional information pertaining to whether the Larson Building transaction should be listed as a related party transaction by representing that Larson Building was a "separate party" from Chris Larson, in connection with Audit Firm #2's review of Ammo's consolidated interim financial statements.

(g)　　On or about each of June 29, 2021, August 16, 2021, November 15, 2021, February 14, 2022, June 29, 2022, and August 15, 2022, Wagenhals and Wiley stated in management representation letters to Audit Firm #2 that Ammo's "[r]elated-party relationships or transactions, including sales, purchases, loans, transfers, leasing arrangements, guarantees, and amounts receivable from or payable to related parties" had been "properly accounted for and adequately disclosed" in either the "consolidated financial statements," or the "interim consolidated financial information," in connection with Audit Firm #2's audits and reviews of Ammo's consolidated financial statements.

165.　As detailed above, these statements were false and misleading because Larson was employed by Ammo at the times the representations were made; the Larson Building transaction was a related party transaction; Ammo had not properly accounted for and adequately disclosed the related party transaction involving Larson Building; and the payment of shares from Larson's wife to Vendor #1 and the repayment and issuance of shares to RW Cabo were related party transactions.

166.　Wagenhals and Wiley knew one or more of the foregoing were false or misleading because, among other things, they worked with Larson, knew Larson's actual responsibilities and role at Ammo, interacted with Larson repeatedly during the time of his employment including by exchanging messages with him and meeting with him, participated in management functions of Ammo in

which Larson was involved, were aware of Larson's involvement in the Larson Building transaction including that the builder of the manufacturing facility in Wisconsin was owned by Larson's brother and that expenditure was a large transaction and expense for Ammo, and were aware of the requirements to report related party transactions, and because, Wiley specifically, exchanged messages with other Ammo employees about a shared intent to mislead outside auditors and knew about Larson's connection to the payment of shares from Larson's wife to Vendor #1 and the repayment and issuance of shares to RW Cabo.

167.   The statements were material because Audit Firm #1 had asked for statements about Larson's employment to be included in its management representation letters, learning that a company's executives had provided false or misleading information to auditors would have changed if and how the audit firm handled its audits or reviews of financial statements, the representations impacted the timing and conditions of Ammo's filing of one or more required SEC reports, the personnel of Audit Firm #1 and Audit Firm #2 would or should have taken additional actions had contradictory information been provided, and the disclosure of related party transactions or employment of an executive officer in violation of a court order could have impacted the audit opinions or reviews of financial statements offered by Audit Firm #1 and Audit Firm #2.

**V.    Wagenhals and Wiley Made False Certifications of Annual and Quarterly Reports.**

168.   Exchange Act Rule 13a–14 [17 C.F.R. § 240.13a-14] requires the principal executive and financial officers of an issuer to personally certify, in each quarterly and annual report, including transition reports, filed or submitted by the issuer under Section 13(a) of the Exchange Act, that the certifying officer has reviewed the report and based on his or her knowledge, the report, *inter alia*, does not contain any untrue statement of a material fact or omit to state a material fact,

and fairly present in all material respects the financial condition and operations of the issuer.

169.    On or about each of August 19, 2020, June 29, 2021, and June 29, 2022, Wagenhals and Wiley falsely certified one or more of Ammo's annual reports on Form 10-K, which contained the false and misleading statements set forth above.  On or about July 31, 2023, Wiley falsely certified Ammo's annual report Form 10-K/A, which contained the false and misleading statements set forth above.  On or about each of February 12, 2021, August 16, 2021, November 15, 2021, February 14, 2022, and August 15, 2022, Wagenhals and Wiley falsely certified one or more of Ammo's quarterly reports Forms 10-Q, which contained the false and misleading statements set forth above.

## VI.    Wagenhals and Wiley Caused Ammo to Make and Keep False Books and Records.

170.    Section 13(b)(2)(A) of the Exchange Act [15 U.S.C. § 78m(b)(2)(A)] requires certain issuers, including Ammo, to make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer.  Exchange Act Rule 13b2-1 [17 C.F.R. § 240.13b2-1] provides that no person shall directly or indirectly, falsify or cause to be falsified, any book, record or account subject to Section 13(b)(2)(A).

171.    On or about each of June 29, 2021 and June 29, 2022, Ammo filed Forms 10-K, and on or about each of February 12, 2021, August 16, 2021, November 15, 2021, February 14, 2022, and August 15, 2022, Ammo filed Forms 10-Q, each of which constituted a book, record, or account, which were false because they did not disclose the related party transaction with Larson Building. In reviewing, signing, and certifying each such book, record, or account, Wagenhals and Wiley, knowing that the transaction with Larson Building was a related party transaction, caused Ammo's books, records, and accounts to be false.

172.    On or about each of June 29, 2021, and June 14, 2023, Ammo filed Forms 10-K, each of which constituted a book, record, or account, and which were false because they misstated Ammo's net loss and Ammo's policy for accounting for stock compensation.  In preparing, reviewing, signing, and certifying each such book, record, or account, Wiley, knowing that the stock-compensation expense was not in accordance with Ammo's publicly stated policy and GAAP and that Ammo's reported net losses were thus not accurate, caused Ammo's books, records, and accounts to be false.

**VII.    Wagenhals and Wiley Must Reimburse Ammo for Certain Compensation Received and Profits Realized from the Sale of Ammo Securities in the Twelve Months Following the Misstated Reports.**

173.    Under Section 304 of the Sarbanes-Oxley Act of 2002 [15 U.S.C. § 7243] ("SOX 304"), if an issuer was required to prepare an accounting restatement due to the material noncompliance of the issuer with any financial reporting requirement under the securities laws as a result of misconduct, the CEO and CFO of an issuer must reimburse that issuer for (1) any bonus or other incentive-based or equity-based compensation they received during the 12-month period following each noncompliant filing, and (2) any profits realized from the sale of securities of the issuer during such 12-month period.

174.    Ammo was required to prepare accounting restatements due to its material noncompliance with the financial reporting requirements of the federal securities laws in its Forms 10-K filed on June 29, 2021, June 29, 2022, and June 14, 2023.  Such restatements were required because of the misconduct set forth above, including Ammo's (1) failure to properly disclose related party transactions involving Larson, (2) miscalculation of stock-compensation expense, and (3) improper characterization of investor relations costs paid to Vendor #1 and Vendor #2, among other reasons.

175.  On May 20, 2025, Ammo filed a Restatement of certain information contained in its previously issued financial statements included in its Forms 10-K filed on June 29, 2022, and June 14, 2023, as well as restated its opening balance sheet as of the beginning of FY 2022 for the cumulative effect of the errors in prior periods, including FY 2021.

176.  Ammo paid Wagenhals at least the following approximate amounts:

| | Wagenhals Compensation | | |
|---|---|---|---|
| Period | June 29, 2021 to June 29, 2022 | June, 29, 2022 to June 29, 2023 | June 14, 2023 to June 14, 2024 |
| Incentive-Based Compensation | $572,463.32 | $478,635.57 | |
| Bonuses | | | $585,290.00 |
| Equity-Based Compensation | $257,400.00 | $715,200.00 | $1,005,200.00 |
| Total | **$829,863.32** | **$1,193,835.57** | **$1,590,490.00** |

177.  Wagenhals also sold or otherwise disposed of at least 530,000 shares of Ammo's common stock during the period from June 14, 2023, to June 14, 2024, for aggregate proceeds of at least $1,105,891.44.

178.  Wagenhals has not reimbursed Ammo for any portion of the bonuses, incentive-based compensation, equity-based compensation, or profits from his sales of Ammo securities that he received during the 12-month periods following Ammo's filing of each misstated Form 10-K.

179.  Ammo paid Wiley at least the following approximate amounts:

| Period | Wiley Compensation | | |
|---|---|---|---|
| | June 29, 2021 to June 29, 2022 | June, 29, 2022 to June 29, 2023 | June 14, 2023 to June 14, 2024 |
| Bonuses | | $129,000 | |
| Equity-Based Compensation | $636,250 | $298,000 | $168,500 |
| Total | $636,250 | $427,000 | $168,500 |

180.   Wiley also sold or otherwise disposed of at least 120,827 shares of Ammo's common stock during the period from June 29, 2022 to June 29, 2023, and at least 6,999 shares of Ammo's common stock during the period June 14, 2023 to June 14, 2024.

181.   Wiley has not reimbursed Ammo for any portion of the bonuses, incentive-based compensation, equity-based compensation, or profits from his sales of Ammo securities that he received during the 12-month periods following Ammo's filing of each misstated Form 10-K.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## <u>CLAIMS FOR RELIEF</u>

### FIRST CLAIM FOR RELIEF
### Material Misstatements and Omissions: Section 10(b) of the Exchange Act and Rule 10b-5(b) Thereunder
(Wagenhals and Wiley)

182.   The SEC realleges and incorporates by reference in this claim for relief the allegations set forth above.

183.   Wagenhals and Wiley, directly or indirectly, acting with scienter, by use of the means or instrumentalities of interstate commerce, or of the mails, or of a facility of a national securities exchange, in connection with the purchase or sale of a security, made untrue statements of material facts or omitted material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, in violation of Section 10(b) of the Exchange Act and Rule 10b-5(b).

184.   By reason of the foregoing, Wagenhals and Wiley, directly or indirectly, violated and, unless restrained and enjoined, will again violate Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(b) [17 C.F.R. § 240.10b-5(b)] thereunder.

### SECOND CLAIM FOR RELIEF
### Aiding and Abetting Ammo's Violations of Section 10(b) of the Exchange Act and Rules 10b-5(b)
(Wiley and Larson)

185.   The SEC realleges and incorporates by reference in this claim for relief the allegations set forth above.

186.   Ammo, directly or indirectly, acting with scienter, by use of the means or instrumentalities of interstate commerce, or of the mails, or of a facility of a national securities exchange, in connection with the purchase or sale of a security made untrue statements of material facts or omitted material facts necessary in order to make the statements made, in the light of the circumstances under which

COMPLAINT                                    57

they were made, not misleading, in violation of Section 10(b) of the Exchange Act and Rule 10b-5(b).

187.   As a result of the conduct alleged herein, Wiley and Larson aided and abetted Ammo's violations of Section 10(b) of the Exchange Act and Rule 10b-5(b) by knowingly or recklessly providing substantial assistance to Ammo.

188.   By reason of the foregoing, Wiley and Larson, directly or indirectly, aided and abetted and, unless restrained and enjoined, will again aid and abet violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(b) [17 C.F.C. § 240.10b-5(b)] thereunder.

**THIRD CLAIM FOR RELIEF**
**Fraudulent Conduct and Acts: Section 10(b) of the Exchange Act and Rules 10b-5(a) and (c) Thereunder**
(All Defendants)

189.   The SEC realleges and incorporates by reference in this claim for relief the allegations set forth above.

190.   Wagenhals, Wiley, and Larson, directly or indirectly, acting with scienter, by use of the means or instrumentalities or interstate commerce, or of the mails, or of a facility of a national securities exchange, in connection with the purchase or sale of a security (i) employed devices, schemes, or artifices to defraud and (ii) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon another person.

191.   By virtue of the foregoing, Wagenhals, Wiley, and Larson, directly or indirectly, violated and, unless restrained and enjoined, will again violate Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rules 10b-5(a) and (c) [17 C.F.C. § 240.10b-5(a) and (c)] thereunder.

### FOURTH CLAIM FOR RELIEF
**Fraudulent Conduct and Acts: Sections 17(a)(1) and (3) of the Securities Act**
(All Defendants)

192.    The SEC realleges and incorporates by reference in this claim for relief the allegations set forth above.

193.    Wagenhals, Wiley, and Larson, directly or indirectly, in the offer or sale of securities, by use of the means or instruments of transportation or communication in interstate commerce or by use of the mails, acting with the requisite state of mind, (i) employed devices, schemes, or artifices to defraud and (ii) engaged in transactions, practices, or a course of business which operated or would operate as a fraud or deceit upon purchasers in violation of Section 17(a)(1) and 17(a)(3) of the Securities Act.

194.    By virtue of the foregoing, Wagenhals, Wiley, and Larson, directly or indirectly, violated and, unless restrained and enjoined, will again violate Section 17(a)(1) and (3) of the Securities Act [15 U.S.C. § 77q(a)(1) and (3)].

### FIFTH CLAIM FOR RELIEF
**Lying to Auditors: Rule 13b2-2 of the Exchange Act**
(Wagenhals and Wiley)

195.    The SEC realleges and incorporates by reference in this claim for relief the allegations set forth above.

196.    By reason of the conduct described above, Wagenhals and Wiley, while acting as officers of Ammo, knowingly (i) made or caused to be made material false or misleading statements to an accountant, or (ii) omitted to state, or caused another person to omit to state, material facts necessary in order to make statements made, in light of the circumstances under which such statements were made, not misleading, to an accountant in connection with (1) any audit, review or examination of the financial statements of Ammo required by the Exchange Act or rules thereunder; or (2) the preparation or filing of any document or report required

to be filed with the SEC pursuant to Section 13(b)(2) of the Exchange Act [15 U.S.C. § 78m(b)(2)], or otherwise.

197.    By reason of the foregoing, Wagenhals and Wiley, violated and, unless restrained and enjoined, will again violate Exchange Act Rule 13b2-2 [17 C.F.R. § 240.13b2-2].

## SIXTH CLAIM FOR RELIEF
### Falsified Books, Records, or Accounts: Rule 13b2-1 of the Exchange Act
(Wagenhals and Wiley)

198.    The SEC realleges and incorporates by reference in this claim for relief the allegations set forth above.

199.    Wagenhals and Wiley, directly or indirectly, falsified or caused to be falsified one or more books, records or accounts of Ammo.

200.    By reason of the foregoing, Wagenhals and Wiley violated and, unless restrained and enjoined, will again violate Rule 13b2-1 of the Exchange Act [17 C.F.R. § 240.13b2-1].

## SEVENTH CLAIM FOR RELIEF
### Certification of Filings: Rule 13a-14 of the Exchange Act
(Wagenhals and Wiley)

201.    The SEC realleges and incorporates by reference in this claim for relief the allegations set forth above.

202.    Wagenhals, as the Chief Executive Officer of Ammo, and Wiley, as the Chief Financial Officer of Ammo, falsely certified (i) that there were no untrue statements or omissions of material facts necessary to make statements not misleading in light of the circumstances in which they were made in Ammo's periodic reports filed with the SEC; and (ii) that those reports fairly presented in all material respects the financial condition and results of the operations of Ammo.

203.    By reason of the foregoing, Wagenhals and Wiley violated and, unless restrained and enjoined, will again violate Rule 13a-14 [17 C.F.R. §§ 240.13a-14].

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## EIGHTH CLAIM FOR RELIEF
### Clawback: Section 304 of the Sarbanes-Oxley Act
(Wagenhals and Wiley)

204.   The SEC realleges and incorporates by reference in this claim for relief the allegations set forth above.

205.   Wagenhals and Wiley received bonuses, other incentive-based or equity-based compensation, or profits from the sale of Ammo securities during the 12-month periods following the first public issuance or filing with the SEC of financial documents embodying financial reporting requirements for which Ammo was required to prepare accounting restatements due to Ammo's material noncompliance resulting from misconduct.

206.   Wagenhals and Wiley received or obtained, during the statutory time periods established by SOX 304, bonuses, incentive, and/or equity-based compensation which each failed to reimburse to Ammo.

207.   By reason of the foregoing, Wagenhals and Wiley are subject to the requirements of Sarbanes-Oxley Act Section 304 [15 U.S.C. § 7243].

## **PRAYER FOR RELIEF**

WHEREFORE, the SEC seeks the following relief:

### I.

Find that the Defendants committed the violations respectively alleged against each Defendant in this Complaint;

### II.

Enter an injunction, in a form consistent with Rule 65 of the Federal Rules of Civil Procedure, permanently restraining and enjoining Defendants and their agents, servants, employees, attorneys, and accountants, and those persons in active concert or participation with them, who receive actual notice of the Final Judgment by personal service or otherwise, and each of them, from engaging in transactions, acts, practices, and courses of business described herein, and from

COMPLAINT                                    61

1   engaging in conduct of similar purport and object in violation of the laws and rules

2   they are respectively alleged to have violated in this Complaint;

3                                               **III.**

4           Enter an injunction, in a form consistent with Rule 65(d) of the Federal

5   Rules of Civil Procedure, permanently restraining and enjoining Defendant Wiley

6   from directly or indirectly acting in an accounting or financial reporting role at a

7   public company in connection with the preparation of financial statements filed

8   with the SEC, providing substantial assistance to a public company in the

9   preparation of financial statements filed with the SEC, or acting as an auditor on a

10  public company audit;

11                                              **IV.**

12          Pursuant to Sections 21(d)(5) and 21(d)(7) of the Exchange Act

13  [15 U.S.C. §§ 78u(d)(5) and 78u(d)(7)], order Defendant Larson to disgorge all ill-

14  gotten gains, together with pre-judgment interest, derived from the activities set

15  forth in this Complaint;

16                                              **V.**

17          Order each Defendant to pay civil money penalties pursuant to Section 20(d)

18  of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange

19  Act [15 U.S.C. § 78u(d)(3)]; and

20                                              **VI.**

21          Issue an order, pursuant to the Court's equitable powers, Section 20(e) of the

22  Securities Act [15 U.S.C. § 77t(e)], and Section 21(d)(2) of the Exchange Act

23  [15 U.S.C. § 78u(d)(2)], barring each Defendant from acting as an officer or

24  director of any issuer that has a class of securities registered pursuant to Section 12

25  of the Exchange Act [15 U.S.C. § 78l] or that is required to file reports pursuant to

26  Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)].

27

28

COMPLAINT                                            62

**VII.**

Order that Defendants Wagenhals and Wiley forfeit certain bonuses and profits and reimburse Ammo as required by Section 304 of the Sarbanes-Oxley Act [15 U.S.C. § 7243].

**VIII.**

Grant such other and further relief as this Court may deem just and proper.

**JURY DEMAND**

The SEC demands a trial by jury on all claims so triable.

Dated:  December 15, 2025                    Respectfully submitted,


                                     By:  */s/* **James P. McDonald**
                                          James P. McDonald
                                          Zachary T. Carlyle
                                          Jeremy Graves
                                          U.S. Securities and Exchange Commission
                                          1961 Stout Street, Suite 1700
                                          Denver, CO 80294-1961
                                          Telephone: (303) 844-1000
                                          Email:    mcdonaldja@sec.gov
                                                    carlylez@sec.gov
                                                    gravesje@sec.gov

                                          *Attorneys for Plaintiff*
                                          *U.S. Securities and Exchange Commission*